UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHELE TILLERY,

                  Plaintiff,

    -against-                               1:13-CV-1528 (LEK/DJS)

NEW YORK STATE OFFICE OF
ALCOHOLISM AND SUBSTANCE
ABUSE SERVICES,

                  Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Michele Tillery commenced this action against her former employer, defendant

New York State Office of Alcoholism and Substance Abuse Services ("OASAS"), and several

OASAS employees, Laurie Felter, Stephen Mantor, and Michael Lawler, alleging unlawful

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq*., and the New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 290 *et seq*. Dkt.

No. 1 ("Complaint"); see also Dkt. No. 19 ("Amended Complaint").[1] Presently before the Court

is OASAS's motion for summary judgment. Dkt. No. 88 ("Motion"); see also Dkt. Nos. 88-1

("Blechner Affidavit"), 88-68 ("OASAS Statement of Material Facts"), 88-69 ("Memorandum").

Tillery opposed the Motion. Dkt. No. 94 ("Opposition"); see also Dkt. Nos. 91 ("Tillery

---

[1]  The individual defendants have been dismissed from this case. The Court dismissed the
Title VII claims against these defendants on May 30, 2014, Dkt. No. 36 ("May 2014 Order") at
10, and the remaining claims were voluntarily dismissed by stipulation in July and August 2016,
Dkt. Nos. 83 ("Mantor Stipulation"), 85 ("Felter Stipulation"), 86 ("Lawler Stipulation").

Response Statement of Material Facts"), 92 ("Tillery Affidavit"). OASAS submitted a reply. Dkt. No. 95 ("Reply"). For the reasons that follow, OASAS's Motion is granted.

## II.    BACKGROUND

### A.  Factual Background

#### 1. The Parties

Tillery is an African American woman who lives in Poughkeepsie, New York. OASAS SMF ¶ 1; Tillery RSMF ¶ 1. In April 2004, Tillery took the New York State Department of Civil Service Facilities Planner 2 ("FP2") examination. OASAS SMF ¶ 12; Tillery RSMF ¶ 12. Later that year, she applied for an FP2 position with OASAS. OASAS SMF ¶ 17; Tillery RSMF ¶ 17.

OASAS is a state agency responsible for overseeing all substance abuse treatment providers in New York State. OASAS SMF ¶ 18; Tillery RSMF ¶ 18. It has two principal offices, one in Albany and the other in New York City, as well as field offices throughout the state. OASAS SMF ¶ 19; Tillery RSMF ¶ 19. At the times relevant to this action, OASAS employed individuals with the FP2 title in two units, the Capital Bureau and the Facilities Evaluation and Inspection Unit ("FEIU"). OASAS SMF ¶ 20; Tillery RSMF ¶ 20. The Capital Bureau was primarily responsible for "manag[ing OASAS's] capital project process," which involved "advising and assisting the provider at every stage of the development, from site selection through a certificate of occupancy," and "development and management of project budgets." OASAS SMF ¶¶ 25–26; Tillery RSMF ¶¶ 25–26. In this role, Capital Bureau personnel regularly worked with the New York State Office of General Services and the state Dormitory Authority. OASAS SMF ¶ 32; Tillery RSMF ¶ 32. Engineering and building construction experience is

considered valuable experience for Capital Bureau job applicants. OASAS SMF ¶ 27.[2] FEIU

performed physical plant and facility inspections of OASAS programs "to ensure continuing

quality and assurance and compliance with OASAS regulations, as well as other applicable state

codes and regulations." OASAS SMF ¶ 22; Tillery RSMF ¶ 22. In other words, the Capital

Bureau oversaw construction and development of new OASAS projects, while FEIU inspected

existing project facilities.

Tillery claims that employment in the Capital Bureau was "more prestigious and career-

advancing," Tillery Counterstatement ¶ 17,[3] and that FEIU employees "were given inferior

assignments," id. ¶ 19.[4] In 2006, the Capital Bureau team consisted of five employees, each of

---

[2] Tillery denies OASAS's statement that engineering and construction experience are valuable skills for Capital Bureau employees by asserting that "under the civil service qualifications, such experience is optional and may or may not be relevant depending on the specific assignments provided the candidate." Tillery RSMF ¶ 27. But the mere fact that construction experience is not required for job applicants does not refute the evidence OASAS presented that it values such experience in applicants.

[3] Tillery submitted her Counterstatement of Facts in the same document as her Response Statement of Material Facts. See Tillery RSMF at 17–40. To avoid confusion, the paragraphs beginning on page seventeen of her Response Statement of Material Facts are cited as "Tillery Counterstatement ¶ ___."

[4] OASAS contests this characterization. Dkt. No. 95-1 ("OASAS Counterstatement") at 6. The Court is obligated to draw all factual inferences in favor of the party opposing summary judgment, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), and therefore accepts Tillery's assertion that Capital Bureau positions were more prestigious than those in FEIU. Nonetheless, the Court is not sure what to make of Tillery's vague complaint that FEIU personnel "were disallowed from completing the full range of tasks associated with their civil service title." Tillery Counterstatement ¶ 50. She does not specify what tasks FEIU employees were not allowed to complete or whether other employees were assigned these tasks.

whom was a Caucasian man. Id. ¶ 38. At the same time, five of the seven FEIU employees were non-white. Id. ¶ 39.[5]

### 2. Tillery's Employment with OASAS

In late 2004, Tillery applied for a position as an FP2 in the Capital Bureau. OASAS SMF ¶ 28; Tillery RSMF ¶ 28. Felter, the Capital Bureau director, interviewed Tillery on December 3, 2004. OASAS SMF ¶ 29; Tillery RSMF ¶ 29. At the time of her application, Tillery held a Bachelor of Arts degree in Applied Mathematics and had most recently worked as a civil engineer at the New York State Department of Transportation ("DOT"). OASAS SMF ¶ 31; Tillery RSMF ¶ 31.[6] Felter ultimately decided to hire a different candidate for the Capital Bureau position, Jeff Emad. OASAS SMF ¶ 34; Tillery RSMF ¶ 34. Emad held a Bachelor of Science in Construction Management and had worked as a construction company project manager, designed recreational facilities for the Office of Parks, Recreation & Historical Preservation, and worked for the Utica Municipal Housing Authority. OASAS SMF ¶ 35; Tillery RSMF ¶ 35. According to

---

[5] Tillery states that the "racial disparity" between Capital Management and FEIU "continued," Tillery Counterstatement ¶ 39, but it is unclear for how long. Tillery presents evidence regarding the units' racial make-up in 2006, id. at ¶¶ 37–38, and suggests the disparity may have existed in 2011, id. at ¶ 39. It is unclear whether the racial disparity continued past 2011.

[6] The parties disagree regarding Tillery's experience managing construction projects while at DOT. OASAS asserts that she had "worked on minor construction projects on railroad crossings." OASAS SMF ¶ 31. Tillery claims she had "worked in many areas of civil engineering, performing capital construction planning and supervision of construction on projects ranging from major capital to minor noncapital construction projects on airport facilities (FAA), rail facilities (FTA), railroad at grade crossing upgrades, local roads, highways, bridges, and other civil engineering work overseen by DOT." Tillery RSMF ¶ 31. This factual dispute is not material to OASAS's Motion.

Felter, she decided to hire Emad instead of Tillery because he had "extensive construction experience" and was more qualified than Tillery. OASAS SMF ¶¶ 32–36.[7]

Felter encouraged Tillery to apply for an FP2 position in FEIU's Albany office, which she did. Id. ¶¶ 37, 39; Tillery RSMF ¶¶ 37, 39. FEIU hired Tillery on March 24, 2005, and she was based out of its Albany office. OASAS SMF ¶¶ 39–40; Tillery RSMF ¶¶ 39–40.[8] Not long after she began at FEIU, Tillery requested a medical accommodation to use a personal or rental car instead of the smaller state vehicle to conduct state business. OASAS SMF ¶ 41; Tillery RSMF ¶ 41. OASAS granted the request on June 30, 2005, and reauthorized the accommodation each year Tillery worked at FEIU. OASAS SMF ¶ 42; Tillery RSMF ¶ 42.

### 3. OASAS Faces Budgetary Strain

In the wake of the Great Recession, OASAS, like most state agencies, faced increased pressure to cut costs and reduce waste. OASAS SMF ¶ 44.[9] In 2008 and 2009, OASAS employees received several communications reminding them to be "meticulous" in submitting travel schedules and reimbursements and that "various reviewers" would be carefully scrutinizing travel records. Id. ¶¶ 45–46; Tillery RSMF ¶¶ 45–46. In June 2010, an audit of

---

[7] Tillery disputes whether Felter believed Emad was more qualified. Tillery RSMF ¶¶ 32–36. She appears to believe that because she satisfied the minimum civil service requirements for the FP2 position, Emad could not be a more qualified candidate. Id. ¶ 33. As explained below, Tillery is mistaken.

[8] Tillery claims she requested a transfer to FEIU's New York City office "[i]n 2006," but cites documents that do not support this assertion. See Tillery Counterstatement ¶ 53 (citing Dkt. No. 93-1 ("Felter Deposition Transcript") at 21). In any event, as explained below, any claim that she was improperly denied a transfer in 2006 is well outside the applicable limitations period.

[9] Tillery denies that the Great Recession imposed budgetary strain on OASAS, but offers no documents to counter the evidence presented by OASAS. Tillery RSMF ¶ 44.

OASAS expressed concerns with the office's billing and reimbursement practices, specifically highlighting unsupported travel and time reimbursements. OASAS SMF ¶ 47; Tillery RSMF ¶ 47. The audit recommended several steps to ensure that travel vouchers and reimbursements were properly calculated and supported. OASAS SMF ¶ 47; Tillery RSMF ¶ 47.

In 2011, following the audit recommendations and in light of ongoing budgetary strain, FEIU implemented several measures to reduce costs and increase efficiency. OASAS SMF ¶¶ 48–52; Tillery RSMF ¶¶ 48–52.[10] Mantor, FEIU's manager, instituted a call-in policy in May 2011, which required inspectors to call in at the end of their inspections "to track efficiency of inspections." OASAS SMF ¶ 48; Tillery RSMF ¶ 48. Later that year, Mantor and Felter assigned inspectors to designated "catchment areas" in an effort to "make travel scheduling more efficient." OASAS SMF ¶ 50; Tillery RSMF ¶ 50.[11] Catchment areas are essentially inspection zones; each inspector was responsible for reviewing the facilities in her assigned area. OASAS SMF ¶ 51; Tillery RSMF ¶ 51. Before the introduction of catchment areas, each inspector chose her own inspection locations, which allowed inspectors to travel more far afield. OASAS SMF ¶ 52.

Tillery was assigned to the catchment area closest to her home, the Mid-Hudson region, which included Duchess, Rockland, Orange, Putnam, Sullivan, Ulster, and northern Westchester Counties. Id. ¶ 53; Tillery RSMF ¶ 53. Tillery claims that she was assigned fewer facilities than

---

[10] Tillery questions the effectiveness of these measures, Tillery RSMF ¶¶ 51–52, but offers no evidence to dispute that they were intended to improve FEIU's efficiency.

[11] Again, Tillery disputes the motivation behind creating catchment areas. Tillery RSMF ¶ 51. Relying solely on her affidavit, Tillery claims that catchment areas "cost more" than the previous method of assigning inspection sites. Id. She cites no deposition transcript or documentary evidence to support this allegation.

other inspectors. Tillery RSMF ¶ 53. While other inspectors were assigned 250 facilities, Tillery

says she was only assigned 151. Id. Tillery's pay was not reduced during this period, or at any

point during her employment at OASAS. OASAS SMF ¶ 54; Tillery RSMF ¶ 54. Tillery claims

she suffered a "constructive pay cut" because she had fewer inspection facilities and therefore

had to commute to the Albany office more frequently for work. Tillery RSMF ¶ 54.

### 4. Issues with Tillery's Time Records

Tillery had several issues with incomplete or incorrect time records while employed at

OASAS. Mantor and Felter spoke to Tillery about improperly completed time records on

multiple occasions. OASAS SMF ¶ 55; Tillery RSMF ¶ 55. Mantor raised specific concerns as

early as January 2008, and again in 2010. OASAS SMF ¶ 55; Tillery RSMF ¶ 55. At some point

in 2011 or 2012, OASAS referred its concerns with Tillery's time records to the New York State

Office of the Inspector General for investigation. Tillery Counterstatement ¶ 105.[12] No

disciplinary actions were taken as a result of the Inspector General's investigation of Tillery's

time records. Id. at ¶¶ 106–107.

On June 18, 2012, Tillery used a rental car to conduct her regular inspection work.

OASAS SMF ¶ 59; Tillery RSMF ¶ 59. When she returned from the inspection, the rental car

---

[12] Tillery claims OASAS made a "criminal complaint" to the Inspector General in 2011. Tillery Counterstatement ¶ 105. Tillery cites an Inspector General case activity report to support this assertion, Tillery Aff. Ex. 11, but the document does not indicate that a criminal complaint was ever made or that OASAS brought the matter to the Inspector General before June 2012. The document does make clear that by June 2012, OASAS provided the Inspector General with Tillery's inspection reports, and that the Inspector General conducted an inquiry into Tillery's conduct. Id. at 15. In any event, the case activity report was not produced in discovery, OASAS Counterstatement ¶ 105, and should not be considered in deciding the Motion, see Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 431 F. Supp. 2d 247, 255 (D. Conn. 2006) (refusing to consider a document submitted in support of summary judgment, but not produced during discovery).

agency, which is approximately four miles from Tillery's home, was closed for the day. OASAS

SMF ¶ 59; Tillery RSMF ¶ 59. Rather than leave the rental car at the agency using the after-hours

dropbox, Tillery drove the car home and returned it the next morning on the way to work.

OASAS SMF ¶¶ 59–60. She then drove from Poughkeepsie to her office in Albany and

submitted time records claiming the entire trip from her home to Albany was work time because

she dropped off the rental car en route. Id. ¶ 61. Because OASAS policy clearly prohibits billing

regular commute time as work, and the rental agency is only four miles from her home, Mantor

told Tillery that she could only submit a time record for the time it took to drive to the agency

and return the car. Id. ¶ 62. Mantor said her time record for this commute should not be more

than thirty minutes, and instructed her to use the after-hours dropbox when returning rental cars

in the future. Id. ¶¶ 63–64.[13] Tillery was not disciplined for submitting improper time records, nor

was her salary reduced. Id. ¶¶ 56–57; Tillery RSMF ¶¶ 56–57.[14]

### 5. Tillery's Lateral Applications

Tillery applied for lateral positions within OASAS several times between 2010 and 2012.

OASAS SMF ¶¶ 65–86; Tillery RSMF ¶¶ 65–86. On April 22, 2010, Tillery applied for an FP2

position in OASAS's New York City office. OASAS SMF ¶ 66; Tillery RSMF ¶ 66. Mantor

---

[13] Tillery denies that these events happened on June18 and 19, 2012, yet relies on evidence that clearly indicates they did. Tillery RSMF ¶¶ 59–61. The exact date, of course, is immaterial, and Tillery does not dispute the underlying facts. Id.

[14] Tillery also claims that Felter accused her of "committ[ing] fraud and violat[ing] time and attendance rules" in May 2011 because she "believed that Lyman and Tillery were discussing complaints of discrimination." Tillery Counterstatement ¶ 91. It is not clear what accusations Tillery is referencing. She relies on Felter's deposition to support her allegation, but the cited pages do not relate to time record issues. See id. (citing Felter Dep. Tr. at 75–76). Even if a claim premised on May 2011 accusations were timely, Tillery has simply failed to present evidence that any accusations were made.

interviewed Tillery for the position, but ultimately decided to hire another applicant, Mohamed Kahn. OASAS SMF ¶ 67; Tillery RSMF ¶ 67. Mantor determined that Kahn was a better candidate because he had more relevant experience and was familiar with the New York City area. OASAS SMF ¶¶ 70–71; Tillery RSMF ¶¶ 70–71.[15] He also believed Tillery was more useful in the Albany office than the New York City branch. OASAS SMF ¶¶ 68–69. According to Mantor, transferring Tillery to New York City would have created a vacancy in the Albany office, which, in light of ongoing budget constrains, he might not be allowed to fill. Id.

On October 29, 2010, Tillery applied for an FP2 position in the Capital Bureau. Id. at ¶ 72; Tillery RSMF ¶ 72. Felter interviewed Tillery for the position, and again hired another applicant, John Kochem. OASAS SMF ¶¶ 73–74; Tillery RSMF ¶¶ 73–74. Felter determined that Kochem was more qualified for the position given his experience as acting Bureau Director for the New York State Office of Children and Family Services. OASAS SMF ¶ 75; Tillery RSMF ¶ 75. In this capacity, he managed numerous capital improvement projects for juvenile justice facilities, group homes, and other facilities. OASAS SMF ¶ 75; Tillery RSMF ¶ 75. Tillery admits that she was "less qualified" than Kochem. Tillery RSMF ¶ 75.[16]

---

[15] OASAS relies on Mantor's deposition testimony to explain its decision to hire Kahn. OASAS SMF ¶¶ 70–71. Tillery disputes OASAS's stated reasons, but relies exclusively on her Affidavit, which does not cite any documents to support her belief. Tillery RSMF ¶¶ 68–69. She does not explain her basis of knowledge regarding Mantor's hiring decisions, and, as an applicant herself, was presumably not involved. While the Court must draw all reasonable factual inferences in Tillery's favor, "conclusory, self-serving affidavits that are unsupported by any factual detail are insufficient to give rise to a dispute of material fact." Cormier v. Gebo, No. 12-CV-1176, 2014 WL 4771897, at *6 (N.D.N.Y. Sept. 24, 2014); accord Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

[16] She also claims, without citation or support, that "Felter only hired white males for Capital Management work." Tillery RSMF ¶ 74.

On April 27, 2011, Tillery applied for the position of Program Manager in OASAS's Mid-Hudson field office. OASAS SMF ¶ 77; Tillery RSMF ¶ 77. The job posting for this position stated that applicants should hold one of several Addictions Program titles, none of which Tillery held. OASAS SMF ¶¶ 78–79; Tillery RSMF ¶¶ 78–79. OASAS hired an applicant who held one of these titles instead of Tillery. OASAS SMF ¶ 80; Tillery RSMF ¶ 80. Tillery was formally denied the position on June 3, 2011. Blechner Aff. Ex. 56 at P000136.

On August 7, 2012, Tillery again applied for an FP2 position in FEUI's New York City office. OASAS SMF ¶ 82; Tillery RSMF ¶ 82. Felter hired another candidate she determined was better qualified than Tillery, Nicholas Protopsaltis. OASAS SMF ¶ 83.[17] Protopsaltis lived in New York City, held a Bachelor of Engineering in Chemical Engineering and a Masters in Environmental Engineering, and had served as the principal engineer for the Interstate Environmental Commission. Id. at ¶¶ 84, 86; Tillery RSMF ¶¶ 84, 86. Before hiring Protopsaltis, OASAS did not have an environmental engineer on staff, and Felter believed it would be helpful to have this expertise in FEIU's New York City Office. OASAS SMF ¶ 85; Tillery RSMF ¶ 85.[18]

---

[17] As before, Tillery denies OASAS's evidence regarding Felter's decision to hire Protopsaltis. Tillery RSMF ¶ 83. She offers no evidence to suggest that Felter's deposition testimony is untruthful, instead asserting, without authority, that the Court "may not credit" her statements because they are "self-serving." Id. The Court is unaware of any such rule.

[18] Tillery denies that Felter believed it would be helpful to have an environmental engineer on staff, relying on her Affidavit statement that Felter never gave "any special environmental assignments" to Protopsaltis. Tillery RSMF at ¶ 85. Her Affidavit cites no documents to support this allegation. Tillery Aff. ¶ 41. It is unclear how Tillery would know what tasks Protopsaltis was assigned without documentary evidence or testimony from Protopsaltis himself, his manager Felter, or another individual involved in assigning him work. In any case, absent admissible evidence from Tillery, a reasonable jury would have no basis to reject Felter's explanation.

### 6. Lyman's Discrimination Complaint

On February 17, 2011, Mark Lyman, a Caucasian male Facilities Planner 1 at FEIU, filed a complaint with the OASAS Office of Affirmative Action. OASAS SMF ¶ 87; Tillery RSMF ¶ 87. Lyman complained that he was discriminated against on the basis of creed when OASAS rejected his application to the Capital Bureau in 2010. OASAS SMF ¶ 87; Tillery RSMF ¶ 87. Tillery was interviewed as part of the investigation into Lynn's allegations. OASAS SMF ¶ 88; Tillery RSMF ¶ 88. During her interview, Tillery stated that she believed she had been discriminated against on the basis of race. OASAS SMF ¶ 89; Tillery RSMF ¶ 89. The Affirmative Action officer dismissed Lyman's complaint on July 5, 2011. OASAS SMF ¶ 90; Tillery RSMF ¶ 90.

At some point after Lyman filed his complaint, Tillery received "negative comments" in her 2010-2011 performance review. Tillery Counterstatement ¶ 97. Specifically, Felter and Mantor noted "some concerns about Michelle's productivity in regard to facility inspections." Tillery Aff. Ex. 10 at OASAS 000113. Tillery does not specify when the performance review was completed, but it appears to have been delivered not long after March 2011.[19]

### 7. Tillery's Departure from OASAS

On April 19, 2013, Tillery left OASAS on medical leave. OASAS SMF ¶ 91; Tillery RSMF ¶ 91. She returned to work for several months in mid-2014, but left again on medical leave on September 8, 2014 and did not return. OASAS SMF ¶¶ 92–93; Tillery RSMF ¶¶ 92–93. Tillery claims that she suffered a hostile work environment when she returned to work between

---

[19]  The evaluation is undated, but the evaluation period is listed as March 24, 2010 through March 23, 2011. Tillery Aff. Ex. 10 at OASAS 000113.

May and September 2014. She claims she was "seated on display outside the unit, causing [her] humiliation," and denied certain building code training. Tillery Counterstatement ¶¶ 121, 123. She also says her request to work remotely was denied, and she was reprimanded for various minor infractions, including taking too long to conduct inspections and "charging for lunch at the end of the day." Id. at ¶¶ 124–26. Tillery was eventually terminated pursuant to New York Civil Liberties Law section 73 after being absent for medical reasons for more than one year. OASAS SMF ¶ 94; Tillery RSMF ¶ 94.

### B. Procedural History

On March 29, 2012, Tillery filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that OASAS discriminated against her on the basis of race and gender. OASAS SMF ¶ 2; Tillery RSMF ¶ 2. EEOC closed its file on Tillery's complaint on September 27, 2012 without making a finding of discrimination, and issued a right-to-sue letter. OASAS SMF ¶ 3; Tillery RSMF ¶ 3.

Tillery commenced this action on January 2, 2013 by filing a pro se complaint in the Southern District of New York. Compl. She alleges that "her career has been limited by the differential terms and conditions of employment on the basis of her race beginning May 2005 ongoing thru [sic] [the date of filing]." Am. Compl. ¶ 7. She also seeks "damages as a result of ongoing employment discrimination, disparate treatment, harassment and retaliation based on her race, African American, beginning May 2005 thru [sic] [the date of filing]." Id. at ¶ 8.

On June 14, 2013, Defendants moved to dismiss the complaint for failure to state a claim and improper venue, or in the alternative to transfer the case to this Court. Dkt. No. 14 ("Motion to Dismiss"). On December 5, 2013, U.S. District Judge Colleen McMahon of the Southern

District of New York denied the motion to dismiss for improper venue and transferred the action

to this Court. Dkt. No. 28 ("Transfer Order") at 11. Judge McMahon did not address the motion

to dismiss for failure to state a claim. Id.

On May 30, 2014, this Court partially granted the Motion to Dismiss. May 2014 Order.

The Court dismissed the Title VII claims against the individual defendants, and dismissed the

HRL claims against OASAS. Id. at 10. In July and August 2016, Tillery voluntarily dismissed the

remaining claims against the individual defendants. Mantor Stipulation; Felter Stipulation;

Lawler Stipulation. On September 30, 2016, OASAS moved for summary judgment on the

remaining Title VII claims. Mot.

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are

irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie

if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924

F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the

nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and of identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves, 530 U.S. at 150; Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to identifying genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.     DISCUSSION

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In an employment discrimination action, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–10 (1993). This initial burden is "minimal." Id. at 506.

Tillery alleges that OASAS's Captial Bureau and FEIU are "structured like . . . a slave plantation with Steve Mantor acting as overseer." Am. Compl. ¶ 12; see also id. at ¶ 34 (alleging

that Tillery "end[ed] up back on a virtual slave plantation stuck, working in the field"); id. at ¶ 40

("The Bureau of Capital Management is still structured like . . . a slave plantation with Steve

Mantor acting as overseer."). Specifically, she claims that OASAS's failure to hire her in the

Capital Bureau in 2005, and subsequent refusal to transfer her within OASAS, constitute

discrimination. Opp. at 2, 8–17; Am. Compl. ¶¶ 9–10, 15–21. By refusing to hire her in the

Capital Bureau, she argues, OASAS "ultimately limited her assignments and opportunities for

advancement." Opp. at 2. Tillery also claims OASAS retaliated against her for supporting

Lyman's discrimination complaint and stating that she had been discriminated against. Id.

at 18–19; Am. Compl. ¶¶ 33–34, 46–69. OASAS managers allegedly retaliated against Tillery by

criticizing her job performance, subjecting her to enhanced scrutiny, and implementing the

catchment area system, which reduced Tillery's workload. Am. Compl. ¶¶ 49–66, 73–74. Finally,

Tillery argues that OASAS subjected her to an unlawful hostile work environment when she

returned from medical leave in 2014 by placing her seat "outside" the FEIU unit, denying her

certain training, reprimanding her for minor infractions, denying her request to work remotely,

and subjecting her time records and reimbursement to "continued scrutiny." Opp. at 20.

As explained below, OASAS is entitled to summary judgment on each of these claims.

**A.  Disparate Treatment Claim**

In order to set forth a prima facie case of disparate treatment in violation of Title VII, a

plaintiff must show that: "(1) she is a member of a protected class; (2) her job performance was

satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under

conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151

(2d Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Once the

plaintiff satisfies her initial burden, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant provides a legitimate, nondiscriminatory reason for the action, "the presumption raised by the prima facie case is rebutted and drops from the case." St. Mary's, 509 U.S. at 507 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)). If a defendant successfully rebuts the prima facie case, the plaintiff can escape summary judgment if she presents evidence that the defendant's explanation is pretext for discrimination. Reeves, 530 U.S. at 143 (citing Burdine, 450 U.S. at 255).

*1. Timeliness of Tillery's Claims*

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006). In general, a Title VII claimant must submit her charge to the EEOC within 180 days from the alleged discriminatory act. 42 U.S.C. § 2000e–5(e)(1). But if the challenged act occurred in a state or locality with its own antidiscrimination laws and enforcement agency, "an employee who initially files a grievance with that agency" has 300 days to file a charge with the EEOC. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). New York has its own antidiscrimination laws and enforcement agencies, and so the 300-day limit applies to Title VII plaintiffs who first file a state grievance. Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996). Here, there is no indication that Tillery ever initiated a state proceeding. But because OASAS states that the 300-day limit applies, Mem. at 6, the Court will apply the longer period, Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 n.1 (2d Cir. 1996) ("We find no reference in the record to Van

Zant having filed her charge with a state or local equal employment agency before filing with the EEOC. However, since the parties agree that the 300-day period applies in this case, we will accept this as a stipulated fact."); Joseph v. Brooklyn Developmental Disabilities Servs. Office, No. 12-CV-4402, 2013 WL 151197, at *4 (E.D.N.Y. Jan. 15, 2013) ("[B]ecause [the defendant] states that the 300-day period applies, I accept this time limit rather than the 180-day limitation.").

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113; accord United Airlines, Inc. v. Evans, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed."). Such an act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequence." Evans, 431 U.S. at 558; see also Yang v. Dep't of Educ. of the City of N.Y., No. 14-CV-7037, 2016 WL 4028131, at *4 (E.D.N.Y. July 26, 2016) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). The Supreme Court has made clear that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . [each] constitute[] a separate actionable 'unlawful employment practice.'" Morgan, 536 U.S. at 114. A plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period.'" Id.

Tillery's disparate treatment claim is based on OASAS's failure to hire her in the Capital Bureau in 2005, and subsequent refusals to hire or transfer her within OASAS. Opp. at 2, 8–17;

Am. Compl. ¶¶ 15–21. Each of these acts "constitutes a separate actionable 'unlawful employment practice.'" Morgan, 536 U.S. at 114. The parties agree that any claims based on acts that occurred before June 2, 2011—300 days before Tillery filed her EEOC complaint—are time barred, Mem. at 6; Opp. at 14, and the Court agrees. Therefore, OASAS is entitled to summary judgment on Tillery's 2005 failure to hire claim, Opp. at 8–9; Am. Compl. ¶¶ 9–10, and the April 22, 2010 and October 29, 2010 denial of transfer claims, Opp. at 13–14; Am. Compl. ¶¶ 16–21. To the extent Tillery bases her claims on any pre-June 2011 failure to promote, Am. Compl. ¶ 14, those claims are also time barred.

## 2. Remaining Failure to Hire and Transfer Claims

Tillery's remaining disparate treatment claims are based on OASAS's decisions not to hire her for the Mid-Hudson Program Manager position in June 2011 or transfer her to the New York City office in August 2012. Opp. at 14–15. In order to survive summary judgment, a plaintiff alleging an unlawful failure to hire or promote must show that she can establish the prima facie case articulated in McDonnell Douglas. Aulicino v. N.Y. City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009). "In all cases, for the plaintiff to avoid an adverse judgment, there must be proof that the plaintiff 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" Id. (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)). Tillery has not met this standard.

As an initial matter, Tillery has not presented evidence that she was qualified for the Program Manager position. The job posting for this position stated that applicants should hold one of several Addictions Program titles, none of which Tillery held. OASAS SMF ¶¶ 78–79; Tillery RSMF ¶¶ 78–79; see also Blechner Aff. Ex. 58 (job posting noting that "candidates

should currently be in the title Addictions Program Specialist 1, Addictions Program Specialist 2, Addictions Planning Analyst 1 or Addictions Planning Analyst 2"). OASAS hired an applicant who held one of these titles instead of Tillery. OASAS SMF ¶ 80; Tillery RSMF ¶ 80. Because she cannot establish that she was qualified for the Program Manager position, Tillery's allegation of discrimination does not survive summary judgment. Moreover, Tillery has offered no proof that she "was rejected under circumstances which give rise to an inference of unlawful discrimination." Aulicino, 580 F.3d at 80. Notably, she makes no claim regarding the race of the unnamed individual OASAS hired for the position. Opp. at 14; Tillery RSMF ¶ 80. Inferring racial discrimination on these facts would be pure speculation.

Tillery's claim that she was discriminated against when she was not transferred to FEIU's New York City office similarly fails. OASAS argues that its denial of Tillery's transfer application is not an adverse employment action because the position "in the New York City office [was] in the same unit, FEIU, with the same title, Facilities Planner 2, as her position in Albany." Mem. at 12. As OASAS correctly notes, "the denial of a transfer (as opposed to a failure to hire or promote) is not considered to be an adverse employment action in the absence of 'objective indicia that the transfer denial created a materially significant disadvantage' with respect to the conditions of a plaintiff's employment." Gaidasz v. Genesee Valley Bd. of Co-op. Educ. Sys. (Boces), 791 F. Supp. 2d 332, 337–38 (W.D.N.Y. 2011) (quoting Beyer v. County of Nassau, 524 F.3d 160, 164 (2d Cir. 2008)). Tillery argues that the denial did have a materially adverse impact on her because she "would have earned $3,000/year more if assigned to New York City and her commute would also have been reduced." Opp. at 14. Tillery cites no evidence to support these claims and therefore fails to raise a genuine issue of fact as to whether she

suffered an adverse employment action. <u>Cormier</u>, 2014 WL 4771897, at *6. Moreover, the Court

questions whether a transfer to New York City would have materially reduced Tillery's

commute. <u>See</u> Google, https://google.com/maps (last visited June 27, 2017) (noting that the

distance from Poughkeepsie, New York to FEIU's New York City office at 501 Seventh Avenue

is eighty miles, while the distance from Poughkeepsie to FEIU's Albany office at 1450 Western

Avenue is eighty-five miles).

Tillery also fails to present evidence that hiring Protopsaltis instead of her "give[s] rise to

an inference of unlawful discrimination." <u>Aulicino</u>, 580 F.3d at 80. She relies on the fact that

Protopsaltis is Caucasian and that "Felter admitted that, by 2012, she had hired no African-

Americans into the Capital Bureau." Opp. at 15. But Protopsaltis was hired in FEIU, not the

Capital Bureau, OASAS SMF ¶ 83; Tillery RSMF ¶ 83, and Tillery has complained that five of

the seven FEIU employees were non-white in 2011. Tillery Counterstatement ¶ 39. It is unclear

how hiring a Caucasian applicant for a position in an office that is largely non-Caucasian could

support an inference of racial discrimination.

Tillery describes FEIU as a "'segregated' sub-unit" of OASAS, Opp. at 2, citing the fact

that all five Captial Bureau employees were Caucasian, while FEIU was largely comprised of

non-Caucasians, <u>id.</u> at 9. But these statistics do not raise an inference of discrimination because

racial breakdown alone "does not make it more or less likely that [OASAS] discriminated against

[Tillery] because of her race." <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 450 (2d Cir. 1999); <u>see</u>

<u>also</u> <u>Baron v. N.Y.C. Dep't of Educ.</u>, No. 06-CV-2816, 2009 WL 1938975, at *6 (E.D.N.Y. July

7, 2009) ("[S]tatistics alone are insufficient in a disparate-treatment claim because an individual

plaintiff must prove that he or she in particular has been discriminated against." (quoting <u>Drake</u>

v. Delta Air Lines, Inc., No. 94-CV-5944, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005))).

Moreover, the small size of FEIU (seven employees) and the Capital Bureau (five employees) makes demographic statistics less meaningful. "The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it." Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 121 (2d Cir. 1997) (collecting cases). Courts in this circuit have regularly disregarded purported statistical showings of discrimination where the sample population is smaller than fifteen. Id. The statistics cited by Tillery do not support an inference of discrimination, and so OASAS is entitled to summary judgment.

Even if Tillery could establish a prima facie case for the June 2011 failure to hire or the August 2012 failure to transfer, OASAS has demonstrated that it had a legitimate, nondiscriminatory reason for selecting other applicants. McDonnell Douglas, 411 U.S. at 802. With respect to the June 2011 denial, OASAS selected an applicant who held one of the titles it identified in the job posting. OASAS SMF ¶¶ 78–79; Tillery RSMF ¶¶ 78–79. Tillery admits that she held none of the specified titles. Tillery RSMF ¶¶ 78–79. Similarly, Felter selected Protopsaltis for the New York City position because she determined that his experience as an environmental engineer made him a more valuable addition to that particular office. OASAS SMF ¶¶ 83–86. Seeking applicants with specific desired credentials is certainly a valid reason to hire one applicant over another, and has nothing to do with race. Schupbach v. Shinseki, 905 F. Supp. 2d 422, 431 (E.D.N.Y. 2012) (noting that hiring "more qualified" applicants is a legitimate, nondiscriminatory reason to select other candidate).

To prevent summary judgment where another applicant was hired or promoted "based on a comparison of applicants' qualifications, a plaintiff must show that [her] credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Johnson v. City of N.Y. Dep't of Parks and Recreation, No. 09-CV-3980, 2013 WL 878821, at *3 (E.D.N.Y. Mar. 8, 2013) (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)). Tillery has not shown—or even alleged—that her qualifications were "so superior" to those of the individuals hired, and the Court sees no indication that they were.

Tillery has failed to show that OASAS's justifications are a pretext for discrimination. She argues that OASAS is "simply making up qualifications to find some reason to prefer the Caucasian candidate," pointing to the fact that she satisfied the minimum civil service requirements for the contested positions. Opp. at 15. But Tillery's "disagreement with the way in which [OASAS] weighed [her] and [other applicant's] qualifications does not create an issue of material fact." Witkowich v. Gonzales, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (citing Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y.1995)). OASAS is free to "decide how it will value the various qualifications different candidates bring to the table." Id. (citing Scaria v. Rubin, 117 F.3d 652, 654–55 (2d Cir. 1997)). Tillery presents no evidence of offensive racial comments by OASAS personnel, or anything else to suggest its justifications are pretextual. Cf. Seltzer v. Dresdner Kleinwort Wasserstein, Inc., 356 F. Supp. 2d 288, 295 (S.D.N.Y. 2005) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a

defendant's decision."). OASAS's preference for other applicants' experiences and credentials, without more, does not suggest pretext. Witkowich, 541 F. Supp. 2d at 582. It is therefore entitled to summary judgment on Tillery's failure to hire and failure to transfer claims.

## B. Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (citing Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006)). To violate Title VII's antiretaliation provision, an employer's actions must be "materially adverse," which "means [they] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006)). Tillery has not presented sufficient evidence to meet this burden.

Tillery argues that OASAS assigned all inspectors to catchment areas in an effort to retaliate against her for participating in Lyman's discrimination complaint and expressing her belief that OASAS had discriminated against her. Opp. at 17. She claims the restructuring qualifies as an adverse employment action because it reduced the number of facilities she inspected, required her to drive to the Albany office more regularly, and allowed other employees to obtain more travel reimbursements. Id. But Tillery presents no evidence regarding other inspectors' areas or the number of facilities assigned to each inspector, and so a jury could not reasonably conclude that she has suffered any adverse employment action. Her claim that she

was somehow placed at a disadvantage because other employees received travel reimbursements, id., makes little sense. It is unclear how reimbursing other employees for money spent while conducting state business confers any benefit on those employees. Absent fraud, travel reimbursements do not advantage an employee; they merely make her whole. The fact that Tillery was not reimbursed for expenses she did not have is precisely the sort of "trivial harm" that does not amount to a materially adverse employment action. Burlington, 548 U.S. at 68.

Even assuming Tillery presented evidence to make a prima facie showing of retaliation, OASAS has clearly established it had a legitimate, non-retaliatory reason to implement catchment areas: it was an effort to "make travel scheduling more efficient." OASAS SMF ¶ 50; Tillery RSMF ¶ 50. Tillery relies entirely on her Affidavit to argue that catchment areas were designed to punish her, Opp. at 17–18, but she herself admitted that catchment areas made inspections "cheaper for the State," Mem. at 19. She also admitted that "there's just too many factors that [she] do[esn't] understand" regarding the costs and benefits associated with assigning catchment areas. Reply at 8. Because Tillery presents no evidence to suggest that OASAS's reason for creating catchment areas was pretextual, her retaliation claim fails.

Tillery also argues that OASAS unlawfully subjected her to enhanced scrutiny and criticism after she participated in Lyman's complaint. Opp. at 18–19. While a plaintiff may indirectly show causation by showing temporal proximity between the protected activity and the adverse act, Colandrea v. Hunter-Tannersville Cent. Sch. Dist., No. 15-CV-456, 2017 WL 1082439, at *11 (N.D.N.Y. Mar. 22, 2017) (Kahn, J.), the record does not support an inference of causation here. OASAS began reviewing Tillery's time and attendance records in 2008, nearly three years before Lyman filed his complaint in 2011. OASAS SMF ¶ 55; Tillery RSMF ¶ 55.

Her supervisors again questioned Tillery's time entries in 2010 and early 2011, about one month before Lyman made his complaint. OASAS SMF ¶ 55; Tillery RSMF ¶ 55. Because OASAS repeatedly scrutinized Tillery's time entries long before Lyman filed his complaint, "no reasonable jury could conclude that [its later scrutiny was] motivated by retaliatory animus arising from" Tillery's protected activity. Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 72 (2d Cir. 2015); accord Weinstock v. Columbia Univ., 224 F.3d 33, 45 (2d Cir. 2000) ("The consistency of the viewpoint expressed . . . further supports [the defendant's] proffered nondiscriminatory reason for [the employment action]."); Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 456 (S.D.N.Y. 2013), aff'd sub nom. Dabney v. Bed Bath & Beyond, 588 F. App'x 15 (2d Cir. 2014) ("Although temporal proximity can sometimes demonstrate a causal nexus, where (as here) the [employment action] was ultimately the product 'of an extensive period of progressive discipline' that began . . . three months before the [protected act], a claim for retaliation cannot be maintained.").

Finally, even if Tillery had not been subject to scrutiny and criticism before Lyman's complaint, her claims would still be subject to dismissal because she offers "no circumstantial evidence that she was treated differently from any similarly-situated employee[ and] there is no direct evidence of retaliatory animus." Richards-Byers v. N.Y.C. Dep't of Fin., 449 F. App'x 55, 57 (2d Cir. 2011). To create an inference of race discrimination, a plaintiff "must compare herself to employees who are 'similarly situated in all material respects.'" Norville v. Staten Island Univ. Hosp. 196 F.3d 89, 95 (2d Cir. 1999) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)). Tillery offers no evidence to provide "any factual basis from which one could infer that any [non-African-American] employee similarly situated to [her]

was subject to differential treatment." Henry v. N.Y.C. Health & Hosp. Corp., 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014). Because Tillery has not presented sufficient evidence to make out a prima facie case of retaliation, OASAS is entitled to summary judgment on this claim.

## C. Hostile Work Environment Claim

"In order to establish a claim of hostile work environment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Demoret, 451 F.3d at 149 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). A plaintiff must show "that the environment was objectively hostile and abusive," not merely that plaintiff perceived the environment to be abusive. Id. (citing Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003)). Isolated incidents generally do not amount to a hostile work environment "unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'" Id. (quoting Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004)). Typically, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Id. (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).

To analyze a hostile work environment claim, a court must "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,' [and] the extent to which the conduct occurred because of plaintiffs' [protected status]." Id. (citation omitted) (quoting Harris, 510 U.S. at 23).

Tillery claims that she suffered a hostile work environment when she returned to work between May and September 2014. She bases her claim on the fact that she was seated outside the FEIU unit, denied certain building code training, reprimanded for various minor infractions, and denied permission to work remotely. Opp. at 20. She also says her time records and reimbursement requests were subjected to "continued scrutiny." Id.

Making all reasonable factual inferences in Tillery's favor, these incidents fall far short of establishing a hostile work environment. As an initial matter, there is no evidence that any OASAS employee ever made any racially insulting comments to Tillery at any point during her employment. Cf. Morgan, 536 U.S. at 120 (affirming denial of summary judgment where plaintiff "presented evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets"). Likewise, nothing in the record supports an inference that any of the acts Tillery highlights were racially motivated.

Much of Tillery's hostile environment claim is premised on the charge that she was unfairly criticized and scrutinized. Absent extreme circumstances, job performance criticism does not create a hostile work environment. See, e.g., Marcus v. Barilla Am. N.Y. Inc., 14 F. Supp. 3d 108, 113 (W.D.N.Y. 2014) ("Although plaintiff peppers her complaint with the words, 'threaten,' 'intimidate,' 'humiliate' and 'harass,' the actual conduct she describes—a series of sporadic, isolated incidents in which managers verbally disagreed with plaintiff or criticized her job performance—falls well short, as a matter of law, of describing discriminatory conduct that is objectively threatening, intimidating, humiliating or harassing."). "[M]ere criticism of an employee's work . . . does not fall within the ambit of Title VII unless [the supervisor's] conduct

is so severe, pervasive, offensive and 'permeated with discriminatory intimidation' as to alter the terms and conditions of his subordinate's employment." Id. at 114 (quoting Harris, 510 U.S. at 21). Tillery has presented no evidence that such extreme conduct occurred here. Tillery's claim that she was subjected to enhanced scrutiny, Opp. at 20, likewise fails to demonstrate a hostile work environment. While Tillery may disagree with her supervisors' assessment of her job performance, there is no indication that she faced threats, intimidation, or humiliation. Tillery claims that placing her chair apart from the rest of the FEIU unit "caus[ed] humiliation." Tillery Counterstatement ¶ 121. While she may have found her seating assignment humiliating, the mere placement of a chair "outside the unit," id., without more, is not "objectively hostile and abusive," Demoret, 451 F.3d at 149.

Tillery also argues that the denial of her request for a medical accommodation under the ADA created a hostile work environment. Opp. at 20. This claim does not withstand scrutiny. It is important to note that Tillery does not allege a hostile work environment under the ADA. Am. Compl.[20] Nothing suggests that Tillery was denied an accommodation because of her race. The letter denying her request provides a reasonable basis for denial and does not reveal any racial animus. Tillery Aff. Ex. 13. While Tillery correctly notes that the Court must consider the available facts in the light "most favorab[le]," to her, Opp. at 20, that does not mean imagining racial animus where none appears to exist.

---

[20] To state a claim for hostile work environment under the ADA, "[a] plaintiff must also demonstrate that [he] was subjected to the hostility because of [his disability]." Dollinger v. N.Y. State Ins. Fund, No. 14-CV-908, 2015 WL 1446892, at *11 (N.D.N.Y. Mar. 30, 2015) (alterations in original) (quoting Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999)).

Simply put, nothing suggests the conditions Tillery faced were "so severe as to be abusive." <u>Demoret</u>, 451 F.3d at 150. OASAS is therefore entitled to summary judgment on the hostile work environment claim.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that OASAS's Motion for Summary Judgment (Dkt. No. 88) is **GRANTED**; and it is further

**ORDERED**, that Tillery's Amended Complaint (Dkt. No. 19) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      July 05, 2017
            Albany, New York



_____
Lawrence E. Kahn
U.S. District Judge